No. 74,943

UNIFIED SCHOOL DISTRICT NO. 500, KANSAS CITY, WYANDOTTE COUNTY, KANSAS, *Appellant,* v. MABLE ROBINSON, *Appellee.*

(940 P.2d 1)

Opinion filed May 30, 1997.

*Deryl W. Wynn,* of McAnany, Van Cleave & Phillips, P.A., of Kansas City, argued the cause and was on the briefs for appellant.

*Richard D. Anderson,* of Anderson Law Offices, of Topeka, argued the cause, and *Brent C. Moerer,* of the same firm, was with him on the briefs for appellee.

*Cynthia Lutz Kelly,* of Topeka, was on the brief for *amicus curiae* Kansas Association of School Boards.

*David M. Schauner, Marjorie A. Blaufuss,* and *Gregory C. Brownfield,* of Topeka, were on the brief for *amicus curiae* Kansas National Education Association.

The opinion of the court was delivered by

SIX, J.: This is a tenured teacher's termination dispute arising under K.S.A. 72-5436 *et seq.,* the Due Process Procedure Act (the

Act). Following nonrenewal of her contract for the 1994-95 school year, Mable Robinson, a second grade teacher in Unified School District No. 500 (the District), Kansas City, Kansas, requested a due process hearing. The hearing officer (HO) found that the District had failed to sustain its burden of proof and ordered reinstatement with back pay and benefits. The District appealed twice, losing in the district court and winning in the Court of Appeals. *U.S.D. No. 500 v. Robinson*, 22 Kan. App. 2d 892, 924 P.2d 651 (1996).

We granted Robinson's petition for review. Our jurisdiction is under K.S.A. 20-3018(b).

The issue is whether the HO erred in reinstating Robinson. What degree of judicial deference should the HO's decision receive? We consider for the first time the appropriate standard of review for a HO's decision on termination. The 1992 amendment to K.S.A. 72-5443 gave the HO final authority to make the good cause to terminate determination subject to appeal to the district court. We consider three questions arising from the Court of Appeals opinion. The questions are variations on the definitional theme addressing the role of the HO in teacher nonrenewal cases.

Did the HO: (1) apply his own standards of teacher performance and thus exceed the scope of his authority; (2) ignore undisputed evidence which supported the District's decision to nonrenew; and (3) act arbitrarily or erroneously in considering the District's evidence of nonrenewal?

We reverse the judgment of the Court of Appeals and affirm the district court. Robinson is reinstated.

## FACTS

Examination of the hearing transcript reveals conflicting and varying versions and interpretations of incidents leading to Robinson's termination. Robinson had been an elementary teacher in the District for 27 years.

Dr. Nelda Kibby was the principal at Lindbergh Elementary School during most of Robinson's tenure and was the main evaluator. Dr. Kibby testified that, even at the beginning, Robinson was a "mediocre" teacher, but that over time and with support she believed Robinson could improve in teaching performance. Dr.

Kibby's concern over Robinson's performance grew, as she had Robinson placed on intensive assistance for the 1993-94 school year.

During the 1993-94 school year, Dr. Kibby and Dr. Georgia Berry, a principal at another elementary school in the district, were to act as a team during Robinson's intensive assistance program. Robinson was to complete the New Teacher Mentor Program in which objectives are provided to help new teachers. Dr. Berry observed Robinson approximately six times. After each observation, she would conference with Robinson on what went well and what needed improvement.

Eva Tucker was an "efficacy consultant" assigned to support and coach Robinson during the intensive assistance program. Tucker observed Robinson approximately six times and worked on goals from the New Teacher Mentor Program. Tucker thought Robinson had difficulty in keeping the children on track, but overall believed Robinson was not a substandard teacher. Debbie Parker was a collaborative special education behavior disorder teacher who spent approximately 2 hours a day in Robinson's classroom during the 1993-94 school year.

By the spring of 1994 the decision was made to terminate Robinson. She received notice of the District's intent to nonrenew her contract for the 1994-1995 school year on the grounds of:

- failure to satisfactorily plan and teach lessons, and
- failure to provide an orderly teaching and learning climate.

As a tenured teacher, Robinson filed a request for a due process hearing. After a 2-day evidentiary hearing, the HO found that substantial evidence did not support the school district's stated reasons for nonrenewal.

Testimony of the witnesses at the due process hearing will be referenced in the Discussion.

## DISCUSSION

### The Hearing Officer's Scope of Authority

The Court of Appeals held that the HO exceeded the scope of his authority by applying his own standards of teacher performance. We disagree.

As provided in the Act, once a teacher receives a nonrenewal notice, the teacher is entitled to request a due process hearing before a HO, who is to make "a fair and impartial decision based on substantial evidence." K.S.A. 72-5439(f).

K.S.A. 72-5443 provides:

"(a) Unless otherwise agreed to by both the board and the teacher, the hearing officer shall render a written opinion not later than 30 days after the close of the hearing, setting forth the hearing officer's findings of fact and determination of the issues. The decision of the hearing officer shall be submitted to the teacher and to the board.

"(b) The decision of the hearing officer shall be final, subject to appeal to the district court by either party as provided in K.S.A. 60-2101, and amendments thereto."

We discussed the legislative history of K.S.A. 72-5443 (the decision of the HO) in *U.S.D. No. 380 v. McMillen*, 252 Kan. 451, 454, 854 P.2d 676 (1993):

"As originally adopted in 1974, 72-5443 permitted a board of education to accept or reject the recommendation of the hearing committee. The statute was amended in 1975 and 1976 . . . . In 1984, the statute was amended to make a unanimous recommendation by the hearing committee binding on the school board. In 1991, the statute was again amended to make all decisions by the hearing committee binding on the school board. During the 1992 legislative session, the hearing process was changed again. The legislature replaced the three-person hearing committee with a single hearing officer. The decision of the hearing officer is final, subject to appeal by either party. L. 1992, ch. 185, §§ 2, 6."

We identified in *Gillett v. U.S.D. No. 276*, 227 Kan. 71, 78, 605 P.2d 105 (1980), the purpose behind the due process hearing:

"The purpose of the due process hearing granted a teacher by statute is to develop the grounds that have induced the board to give the teacher notice of its desire to discontinue her services, and to afford the teacher an opportunity to test the good faith and sufficiency of the notice. The hearing must be fair and just, conducted in good faith, and dominated throughout by a sincere effort to ascertain whether good cause exists for the notice given. If it does not, or if the hearing was a mere sham, then justification for the board of education's action is lacking."

### Standard of Review—Scope of Review

The scope of review limits the area we may question in reviewing an agency decision. See *In re Hood*, 252 Kan. 689, 690, 847 P.2d 1300 (1993). The standard of review refers to the legal scale we

use in weighing a claim of error. See *Dillon Stores v. Lovelady*, 253 Kan. 274, 275, 855 P.2d 487 (1993). Here, the district court and Court of Appeals limited their scope of review to the same evidence that was presented to the HO. Neither side takes issue with the scope of review applied. We focus on the standard of review, *i.e.*, the degree of deference the HO's decision should receive.

The Court of Appeals opinion sets out the proper factors the HO must consider, the standard of review, and the definition of "good cause" applied in teacher due process hearings as follows:

"The three factors that should have guided the hearing officer in his decision were: (1) The burden of proof was on the school board, (2) the school board's reasons for termination had to constitute good cause, and (3) the decision had to be supported by substantial evidence. See *U.S.D. No. 434 v. Hubbard*, 19 Kan. App. 2d 323, 326, 868 P.2d 1240, *rev. denied* 255 Kan. 1007 (1993).

"The standard of review of a due process hearing officer's decision is limited to deciding if: (1) the hearing officer's decision was within the scope of the officer's authority; (2) the hearing officer's decision was supported by substantial evidence; and (3) the hearing officer did not act fraudulently, arbitrarily, or capriciously. See *Hubbard*, 19 Kan. App. 2d at 326.

"When a district court's decision is appealed, we review the hearing officer's decision as though the appeal has been made directly to us, and we are subject to the same limitations of review as the district court. See *Butler v. U.S.D. No. 440*, 244 Kan. 458, 464, 769 P.2d 651 (1989)." 22 Kan. App. 2d at 894-95.

We agree.

In exercising judicial review, we may not reweigh the evidence and substitute our judgment for that of the HO. *U.S.D. No. 434 v. Hubbard*, 19 Kan. App. 2d 323, 328, 868 P.2d 1240, *rev. denied* 255 Kan. 1007 (1994) (citing *City of Topeka v. Board of Shawnee County Comm'rs*, 252 Kan. 432, 446, 845 P.2d 663 [1993]).

*Amicus curiae* Kansas Association of School Boards (KASB) suggests that the administrative standard of review applied by the Court of Appeals may be too restrictive because the HO is not required to have any expertise on school administration. KASB argues that the broader, more de novo standard of review used in *Murray v Montrose County School Dist.*, 51 F.3d 921 (10th Cir. 1995), should apply. *Murray* involved a student's challenge to a change of schools under the Individuals with Disabilities Education

Act (IDEA), 20 U.S.C. §§ 1400-1485 (1994). The school district decided to move the student who had cerebral palsy from his neighborhood school to a more distant school with a program for children with severe disabilities. The IDEA contains its own standard of review. Unlike the IDEA, the Act here contains no standard of review provision. However, K.S.A. 72-5443(b), which grants the right to appeal the HO's decision to the district court, references K.S.A. 60-2101 (judicial review of an administrative agency decision).

In *Brinson v. School District*, 223 Kan. 465, 469, 576 P.2d 602 (1978) we viewed the school board as an administrative agency or tribunal. In *Butler v. U.S.D. No. 440*, 244 Kan. 458, 463, 769 P.2d 651 (1989), in reviewing a school board's nonrenewal decision (the board rejected the hearing committee's 2-1 recommendation for reinstatement), we applied the same administrative tribunal standard of review as in *Brinson*.

A HO does not fit smoothly into the K.S.A. 60-2101(d) term "political or taxing subdivision, or any agency thereof, exercising judicial or quasi-judicial functions." However, under K.S.A. 72-5438(f), the Commissioner of Education maintains a list of qualified HOs to be used when a teacher requests a due process hearing. The teacher and the board of education are given input into the process of selecting the HO from the list. K.S.A. 72-5438(a)-(d). Attorneys interested in serving as HOs submit their applications to the Commissioner of Education. K.S.A. 72-5438(g). K.S.A. 72-5438(h) sets forth the statutory requirements for HOs.

The legislature did not amend K.S.A. 60-2101(d) in 1991 or 1992 or provide a standard of review for the HO's decision. We reason that the legislature intended that the standard of review applied to a HO's decision remains as established by *Brinson* and *Butler*.

The District, citing *Gillett*, 227 Kan. at 79, argues that if the Board presents substantial evidence to establish good cause, it has met its burden of proof and the HO must accept the decision to nonrenew, even if the HO would reach a different conclusion. The District misunderstands the HO's scope of authority. *Gillett* considered a teacher termination under the previous statutory procedure, in which the hearing committee only made a recommenda-

tion and the school board retained final authority to terminate. Under that earlier procedure, the school board functioned in a dual (and conflicting) capacity as its own advocate at the due process hearing and the reviewer of its own decision after the hearing committee made its recommendation. The board's decision was final, subject to appeal to the district court. See *Kelly v. Kansas City, Kansas Community College*, 231 Kan. 751, 759-60, 648 P.2d 225 (1982) (describing this dual role).

The 1991 statutory amendment placing the authority to make the final good cause determination in an independent hearing committee (HO after the 1992 amendment) eliminated the conflict of interest the board faced under the earlier procedure.

The statements in *Gillett* that the district court cannot substitute its judgment for that of the school board, pertained to the board's reviewing authority, not the board's advocacy role, under the earlier statutory procedure. The District's reliance on *Gillett* for the contention that the HO cannot substitute his judgment for that of the school board is misplaced. K.S.A. 72-5443 gives the HO authority to make the final good cause determination.

In arguing that the HO had exceeded his statutory authority, the District advances a modified version of the constitutional argument we rejected in *McMillen*, 252 Kan. 451. The District contends that if the HO can decide what persons deliver educational services to Kansas students, then the District's constitutional authority to determine if teachers are performing their duties capably is being usurped. In *McMillen*, we rejected the argument that the 1991 amendment to the teacher due process statute (giving a hearing committee the final authority to make the good cause determination) violated the school board's mandate under Article 6, §§ 2 and 5 of the Kansas Constitution to maintain, develop, and operate the local school system. 252 Kan. at 464.

The *Hubbard* court, applying the 1991 amendment, said: "[A] due process hearing committee is the factfinder. Accordingly, a hearing committee must decide whether the reasons given by a school board in its decision to terminate or nonrenew a tenured teacher's contract constitute good cause." 19 Kan. App. 2d 323, Syl. ¶ 1. The District decided not to renew Robinson and notified

her of the reasons for nonrenewal. The HO was to determine whether the reasons given by the District for nonrenewal showed "good cause" and, if so, whether substantial evidence supported those reasons. The HO's decision that the District failed to meet its burden of proof was based on his finding that the District failed to present substantial evidence supporting the stated reasons for nonrenewal.

The District argues that the HO did not conclude the basis for nonrenewal was irrational, unreasonable, arbitrary, or unrelated to the District's task of building up and maintaining an efficient school system. The District is correct; however, the HO found that the District had not sustained its burden of proof in establishing the basis for nonrenewal.

The reasons for nonrenewal relied upon by the District do not lend themselves well to objective determination. The District, through Dr. Kibby and Dr. Berry, presented evidence that Robinson failed. Robinson, through her testimony and that of Eva Tucker and Debbie Parker, presented evidence that she had not.

The District asserts that the HO and the District applied different standards of performance. One problem with the District's "different standards" argument is that it is difficult to pin down what the District's standards are and how they differ from the HO's, other than in the ultimate conclusions reached. As the HO stated, satisfactory teacher performance is "what the administrator says is satisfactory."

The District did not give Robinson any additional reasons for the nonrenewal, other than what was stated in the notice. Either there was substantial evidence that Robinson failed to satisfactorily plan and teach lessons and failed to provide an orderly teaching and learning climate, or there was not. The HO concluded that there was not. The evidence was conflicting. We do not agree that the HO applied different standards of teacher performance to reach his conclusion. Absent any showing that the District's and HO's standards were different, the fact that the HO considered the evidence presented at the hearing and reached a different conclusion should not, by itself, establish that the HO applied different teacher performance standards. It is for the HO, not the district

or appellate courts, to weigh the evidence and make findings of fact and determine if Robinson's termination was for good cause.

## The Conflicting Evidence

The District's case was built primarily on the testimony of Dr. Kibby, supplemented by the testimony of Dr. Berry. Although Ray Daniels, an assistant superintendent with the District, also testified, he had little, if any, personal knowledge concerning Robinson's teaching. Robinson testified, as did Debbie Parker, who collaboratively taught with Robinson in the 1993-94 school year, and Eva Tucker, Robinson's coach during the intensive assistance period. Connie Ellington, an assistant superintendent with the District and supervisor of Dr. Kibby during the 1993-94 school year, also testified as Robinson's witness.

Dr. Kibby described the student body at Lindbergh. There was a 45 to 50 per cent turnover rate in the students each year. Approximately 80 per cent of the students are "at-risk" students. When asked about students bringing guns to school, Dr. Kibby testified: "Yes. You're in an area—a low income area with four active gangs in the housing district, and they brought toy guns to school, but it was not acceptable, and we dealt with those things."

In summing up the factors contributing to her recommendation of nonrenewal, Dr. Kibby stated:

"We've talked about she failed to plan and teach, and we talked about the fact that her behavior management was not adequate, and I think one of the main things was that there was no improvement. If Ms. Robinson would have made gains as time went by, things—you know, things would have played out differently, but over the eleven years that we were at Lindbergh, the students' needs did increase, and there were more children with problems and—but her skills did not improve and so one big thing was the fact that she didn't improve. The second thing that really began to bother me was that in the last two years I sincerely believed that I knew that she was emotionally and physically abusing children. And before that time, I saw her as a teacher that was just below standard that I was working with, but when children are actually being hurt by the things, then I'm pressed to make—make a decision."

Dr. Kibby also stated that Robinson's failure to maintain records (accurate grade records), failure to supervise children outside her classroom, failure to use team resources (such as the needs assess-

ment procedure), inadequate parent attendance at parent-teacher conferences, and failure to use manipulatives (objects children can handle to learn concepts) in class also factored into Dr. Kibby's decision to recommend nonrenewal.

Both Dr. Kibby and Robinson testified about an incident involving one of Robinson's students, D. (the D. incident), which took place in May 1993. Dr. Kibby portrayed Robinson as unable to control D. and as using abusive language toward the student. Robinson was placed on intensive assistance shortly after the D. incident. Robinson characterized herself as appropriately dealing with a difficult child with whom she needed assistance.

Initially, during the intensive assistance, Dr. Berry and Dr. Kibby met with Robinson to go over the objectives of the New Teacher Mentor Program. An "action plan" was developed for Robinson, stating the goals and steps to those goals that she was to work on. Dr. Berry described Robinson's teaching as inconsistent:

"There would be periods where there was—the modeling was great. The lesson presentation was good. Interaction with the students was enthusiastic. And then there would be periods when it would not be. It would be the exact opposite."

Dr. Berry did not believe that Robinson performed to the level required of second grade teachers at Lindbergh. Based on her observations, Dr. Berry saw substandard teaching from Robinson. Dr. Berry believed that Robinson failed to satisfactorily plan and teach lessons, because she did not do so consistently. Dr. Berry felt Robinson resisted her suggestions. When Dr. Berry was asked whether Robinson failed to provide an orderly teaching and learning climate, Dr. Berry agreed that Robinson failed to provide a learning climate. "Orderly, I didn't see anything where it was detrimental." Dr. Berry pointed out that Robinson did not use manipulatives in teaching math lessons after Dr. Berry had suggested it. On cross-examination, Dr. Berry admitted that Robinson had met the goal of "selecting the goals, objectives and instructional methods appropriate to students' needs" on several occasions. When asked about the recommendation for nonrenewal, Dr. Berry made it clear that her responsibility in this matter was to assess and

assist—not to make any type of recommendation for nonrenewal, and that the ultimate decision to nonrenew was Dr. Kibby's.

The testimony of Debbie Parker, who spent 2 hours a day in Robinson's classroom during the 1993-94 school year teaching English and math classes collaboratively with her, provided a different view of Robinson's classroom conduct. Parker was a second-year teacher at the time she worked with Robinson. She spent the 1992-93 and 1993-94 school years at Lindbergh and then requested and obtained a transfer to another elementary school in the district for the 1994-95 school year.

Parker described the students at Lindbergh. She named three (including T.) in Robinson's class who were particularly difficult for both Robinson and her to handle. She and Robinson took similar actions in trying to control them. She saw Robinson as doing an acceptable job in dealing with the difficult students and being as good at dealing with them as other teachers at Lindbergh. She never observed Robinson emotionally or physically abuse any student. Parker admitted that she told Dr. Kibby about an incident with T. Parker described T. as a boy who would come at her and other students with rulers, pencils, books, feet, and hands, stabbing and hitting. Parker told Dr. Kibby that Robinson had shoved T.'s chair up against his desk. Parker was not concerned that T. was hurt, but was concerned with the way the situation was handled. However, in retrospect, Parker felt that she had overreacted, because Dr. Kibby had told her ahead of time that Parker needed to document everything with Robinson. "[Dr. Kibby] had me thinking I was going to get sued for whatever happened in that room, so I overreacted." Parker testified that Robinson's actions were directed at trying to get T. to comply; she was not trying to shove T. out of the way. "[Robinson] had so many kids in her room that were so disruptive that it was very difficult to teach in her room. I mean, she had a lot of kids with a lot of problems." Parker recalled hearing Robinson saying things to her students about the "doughnut head" or "don't make me have to talk black to you."

Parker began the 1993-94 school year with some preconceived ideas about Robinson:

"I was really worried about working with Mable because of the things that I had heard from the collaborative teacher from the year before and from Ms. Kibby. I am not a really assertive person, and I was concerned that I would have difficulty standing up and getting what I needed to get across across."

However, her opinion of Robinson grew during the year: "As the year went on and after she was put on intensive assistance and Ms. Kibby gave her a list of goals to work on, Mable really tried to follow those goals, to reach those goals." During a pause in her cross-examination, while being questioned about what she had reported to Dr. Kibby about Robinson, Parker stated:

"Can I make a statement? This is extremely frustrating. But you guys are asking all these questions, but I think you're missing the whole point of the whole thing. Mable is not perfect, but none of us are.

"When Ms. Kibby came up with all these things she had to do, Mable tried. I sat in her room and I watched. I talked with her about these things. We worked. She tried. She really tried. And no matter what Mable did, Nelda [Dr. Kibby] could not see anything positive. She just jumped on the negative things. She did not even attempt to say anything positive."

During Parker's cross-examination, it became apparent that many of Dr. Kibby's complaints about Robinson's allegedly abusive conduct toward students (such as telling students "don't act retarded," using the term "doughnut head," "talking black" to the black students or separately addressing the black students as a group, and the T. incident) were based on what Parker had told Dr. Kibby. Parker resisted questioning about this.

Parker's testimony may have hurt Dr. Kibby's credibility. Although Parker's role was not to evaluate, Parker spent much more time in Robinson's classroom during the year of intensive supervision than either Dr. Kibby or Dr. Berry. She had not worked with Robinson before that year. Parker's views were based on what she saw in Robinson's classroom in the 1993-94 school year.

Eva Tucker, an efficacy consultant employed by the District and a friend of Robinson's, had 19 years of teaching experience. Her job was to try to instill in teachers that they have the power to make a difference for children and the learning environment so that all children can develop for a quality life. Robinson requested that Tucker assist her during the intensive assistance program. Tucker

understood that she would support Robinson and coach her along. She was not required to report back to Dr. Kibby on her observations of Robinson. Beginning in January 1994, Tucker observed Robinson on six occasions. She also modeled a class for Robinson. Tucker testified that Robinson (1) presented lesson content in a clear, logical, and sequential manner; (2) selected goals, objectives, and instructional methods appropriate to the individual student's needs; and (3) planned for congruence so that the anticipatory set, input activities, responses, and enrichment activities were congruent to the lesson objective. These were the goals identified by Dr. Kibby in a letter to Robinson as the three "Phase I goals" that Drs. Kibby and Berry would focus on and Tucker should work with Robinson on. Although Tucker made clear that her role was not to evaluate Robinson, when asked her opinion, Tucker stated that Robinson was not a substandard teacher. At the conclusion of Tucker's testimony, the HO asked her to review a sample of Robinson's lesson plans from the 1992-93 school year. Tucker stated that she could teach from them, although her own lesson plans are a little bit more detailed. Tucker also reviewed samples of Robinson's lesson plans from the 1993-94 school year and when asked if those were adequate, stated that they were "okay," although Tucker would have more detail in hers.

Although the District appeared to have an abundance of "good cause" evidence to support Robinson's nonrenewal, there are inconsistencies in the District's evidence. If Robinson was such a poor teacher and had always been substandard, why was action not taken sooner? Why did Robinson consistently receive satisfactory ratings? Why did Dr. Kibby at first testify that she thought Robinson had always been a substandard teacher, but later testify that Robinson was initially a mediocre teacher who became substandard? After Robinson received negative evaluator comments on her February 1992 evaluation, why was she given a positive evaluation in April 1993? Why was she placed on intensive assistance 2 months after receiving that positive evaluation? Was the D. incident sufficient reason to place Robinson on intensive assistance? After being placed on intensive assistance, was she or was she not given a written evaluation in November 1993? (Dr. Kibby char-

acterized it as an evaluation, even though the form used was labeled "goal status." Robinson did not consider it an evaluation.)

None of the witnesses characterized Robinson as a star teacher. Even Robinson saw herself as no better than a "very good average teacher." The testimony of Parker, Tucker, and Robinson casts doubt on the credibility of the District's evidence of Robinson's teaching and classroom management deficiencies.

The HO could have ruled either way. The evidence presented by both sides was conflicting. It does not appear that the HO applied his own standards of teacher performance but simply determined which evidence was more credible.

## Ignoring Undisputed Evidence

Robinson attacked the credibility of the District's evidence by calling into question whether her alleged shortcomings in the classroom were the real reason for Dr. Kibby's placing her on intensive assistance and then later recommending nonrenewal. Also, Tucker's and Parker's testimony contradicted the District's evidence that Robinson resisted Dr. Kibby's and Dr. Berry's efforts to help Robinson improve during her intensive assistance period. Parker spent significantly more time in Robinson's classroom than either Dr. Kibby or Dr. Berry. It is not surprising that the HO would give more weight to Parker's testimony.

It does not appear that the HO ignored undisputed evidence. Instead, the HO weighed the credibility of all evidence presented, and in his view, the balance of the scale fell on Robinson's side.

## Actions of the Hearing Officer—Arbitrary or Erroneous?

The District contends that HO improperly applied *Haddock v. U.S.D. No. 462*, 233 Kan. 66, 78, 661 P.2d 368 (1983) ("A teacher . . . is entitled to be judged solely on the reasons enunciated in the notice of nonrenewal.") in determining that the notice of renewal given by the District did not state that Robinson was being terminated for inefficient or incompetent service.

*Haddock* involved the earlier statutory procedure in which the board of education had authority to decide whether to accept or reject the recommendation of the due process hearing committee.

The reasons the board gave to the hearing committee for nonrenewal were not the same reasons the board gave in its final resolution to terminate Haddock; thus, Haddock's due process rights were violated.

Here, the question is whether the District gave sufficient notice to Robinson of its reasons for nonrenewal so that Robinson had a fair opportunity to respond to them at the due process hearing, as required under *Loewen v. U.S.D. No. 411*, 15 Kan. App. 2d 612, Syl. ¶ 3, 813 P.2d 385 (1991). The HO observed that the District presented opinion evidence that Robinson was a substandard or incompetent teacher, but those reasons were not stated as reasons for nonrenewal in the notice of nonrenewal the District gave to Robinson.

The District contends that the HO improperly restricted the evidence considered to the reasons stated in the notice of nonrenewal. The District was free to supplement its reasons for nonrenewal by notifying Robinson of any additional reasons before the hearing, but did not do so.

The Court of Appeals observed: "The hearing officer appears to have concluded that because the notice of nonrenewal did not specifically claim that Robinson was a 'substandard' ·or an 'incompetent' teacher, any evidence of substandard teaching or incompetence would be ignored." 22 Kan. App. 2d at 898. The Court of Appeals' conclusion is apparently based upon the following statement in the HO's opinion:

"38. Whether, as some of the witnesses testified, Mrs. Robinson is a substandard teacher, is not to be considered. 'A teacher who's [*sic*] contract is being nonrenewed is to be judged solely on the reasons enunciated in the notice of nonrenewal.' (*Loewen*, 15 Kan. App. 2d 612, 619)."

However, the HO's findings of fact refer to the opinions of various witnesses as to whether Robinson was a substandard teacher. Finding No. 60 stated in part:

"60. . . . This examiner wants to make it clear that under the evidence presented, Mrs. Robinson does not appear to be an incompetent teacher. The evidence is conflicting as to whether or not she was a substandard teacher. Based on the evidence presented at this hearing, this examiner would not have found that Mrs. Robinson was a substandard teacher and if that reason would have been put

forth by the board as a reason for nonrenewal, I would have made the same decision as I [am] making in this order."

The Finding No. 60 statement shows that the HO did not ignore evidence of Robinson's substandard or incompetent teaching but instead considered it in connection with the grounds for nonrenewal stated in the District's notice (failure to satisfactorily plan and teach lessons and failure to provide an orderly teaching and learning climate). The terms "substandard" and "incompetent" are general terms that would have little meaning without evidence of specific actions showing substandard or incompetent teaching.

We disagree with the Court of Appeals' application of the standard of review, although its statement of that standard is correct. We apply the "administrative tribunal" standard of review to the HO's decision.

The judgment of the Court of Appeals reversing the district court is reversed, and the judgment of the district court is affirmed.