No. 87,553

KANSAS STATE BOARD OF EDUCATION, *Appellee*, v. CHARLES E. MARSH, JR., *Appellant*.

(50 P.3d 9)

Opinion filed July 12, 2002.

*Scott C. Long*, of McCormick, Adam & Long, P.A., of Overland Park, argued the cause, and *David M. Schauner* and *Ryan D. Hickman*, of Kansas National Education Association, of Topeka, were with him on the brief for appellant.

*Dan Biles*, of Gates, Biles, Shields & Ryan, P.A, of Overland Park, argued the cause, and *Rodney J. Bieker*, of Kansas Department of Education, was with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is a tenured teacher termination dispute under K.S.A. 76-11a04 *et seq.*, the statutes covering employees of the Kansas State School for the Blind and the Kansas State School for the Deaf.

Charles Marsh's employment as a long-time teacher at the Kansas State School for the Deaf (KSSD) was terminated by the Kansas State Board of Education (Board) as the result of an investigation following the death of a KSSD student, Justin Barrett, who was struck by a train while moving railroad ties to Marsh's property in Missouri. Marsh requested a due process hearing under K.S.A. 76-11a06.

The three-person hearing committee held a due process hearing and reversed the Board's decision and ordered Marsh reinstated.

The Board appealed the decision to the district court as allowed by K.S.A. 60-2101(d), and the district court reversed the committee's decision. Marsh appeals. Our jurisdiction is pursuant to K.S.A. 20-3018(c) (transfer on our own motion).

*Factual and procedural background*

Testimony of numerous witnesses will be summarized and discussed later, but the following facts were stipulated to by the parties before the hearing committee:

"1.   In August, 1996, Charles Marsh, a teacher at the Kansas State School for the Deaf ('KSSD'), purchased approximately forty acres of unimproved land with a small fishing lake near Hume, Missouri.

"2.   Access to Mr. Marsh's property is via gravel road approximately 2.3 miles from Missouri Highway 'V', a hard surface road.

"3.   Approximately 1½ to 2 years ago, in an activity independent of the Kansas State School for the Deaf, Mr. Marsh arranged for students and staff to work on or near the property to improve it.

"4.   Chris Kurz, a teacher and coach at the Kansas State School for the Deaf and a close friend of Mr. Marsh's son, had worked on Mr. Marsh's property in 1998.

"5.    Mr. Marsh states that staff and students at the KSSD who were Mr. Marsh's nephews, over the course of years, had been involved in moving railroad ties from railroad property.

"6.    Mr. Marsh's goal for developing his property in Missouri is to create an area for uses such as camping.

"7.    On February 28, 2000, Mr. Chris Kurz asked Assistant Football Coach Kevin Milner to recruit KSSD football players to go to Mr. Marsh's property to move railroad ties. Because of the weight of the ties (150 lbs.) only KSSD football players were asked to participate.

"8.    The field trip was originally planned for March 4, 2000, however because the written request for the trip was not received one week in advance as required by KSSD policy, the request was denied by LuAnn Ward, Head Teacher.

"9.    Mr. Kurz eventually gained approval for the field trip from Ms. LuAnn Ward who signed the request form on March 6, 2000. . . .  It was agreed that the field trip would occur on March 11, 2000. On this form Mr. Kurz is identified as the lead teacher of the activity. The list of participants included Mr. Kurz, Mr. Marsh, Justin Barnett, Brian Harmon, Shane Qualls, and Tony Green. Students Shane Qualls and Tony Green did not attend the March 11, 2000 field trip.

"10.    On the field trip request form the purpose of the trip was stated to be 'Community servicehelp Charles Marsh move train tracks to his Haven.' 'Haven' is the name of the property owned by Mr. Marsh.

"11.    Before Ms. Ward gave her approval for the field trip, she asked Mr. Kurz for clarification of the words, 'train tracks.' Ms. Ward was told that it meant moving railroad ties to Mr. Marsh's property.

"12.    According to Mr. Kurz, Mr. Marsh did not disagree with the explanation when it was given to Ms. Ward. Ms. Ward stated that she understood the activity involved moving railroad ties to Mr. Marsh's land, but did not understand that it would involve activity in close proximity to active railroad tracks. In fact, Ms. Ward advised the fact-finding committee appointed by the Commissioner of Education that if she had known that the activity was to be in close proximity to an active railroad track, the activity would not have been approved.

"13.    On Saturday, March 11, 2000, approximately 5-8 inches of snow fell at the location of Mr. Marsh's property. Mr. Kurz picked up Justin Barnett and Brian Harmon at KSSD and transported them in a KSSD van to Mr. Marsh's property where they arrived at 10:30 A.M.

"14.    Shane Qualls and Tony Green did not go to Mr. Marsh's land on March 11, 2000. Tony Green slept in and missed the trip, and Shane Qualls went to Florida for spring break.

"15.    Mr. Marsh met Mr. Kurz, Justin Barnett and Brian Harmon at his property, gave the group a tour of the property and then led them to the railroad tracks to search for railroad ties.

"16.    Both Mr. Marsh and Mr. Kurz reported that they talked to the students about safety, particularly constant looking because trains came by periodically on the tracks.

"17.    From approximately 10:30 A.M.-11:30 A.M., the students and Mr. Kurz moved railroad ties from the east side of the track to Mr. Marsh's property.

"18.    Mr. Marsh did not have formal approval from the railroad to be on the right-of-way of the railroad and the railroad tracks.

"19.    At some point in the morning of March 11, 2000, Charles Marsh left the others at the railroad tracks and returned to his property to prepare lunch. Mr. Marsh stated that as he prepared lunch, he could not see the activities on the railroad track.

"20.    According to Mr. Kurz, at about 11:30 A.M. the group decided to obtain ties on the west side of the tracks. Mr. Kurz crossed the tracks to get the railroad ties. He then brought them back over the tracks and deposited them on the east side of the tracks. At this point in time, only Mr. Kurz and the two students were working.

"21.    The moving of the ties as agreed to by Mr. Marsh and Mr. Kurz also involved Mr. Kurz and one of the boys putting a railroad tie across the tracks and scooting it on the tracks toward the gravel road. They then placed [it] on Mr. Marsh's property.

"22.    Mr. Kurz reported that he told Justin to stand in the ditch and keep watch while he and Brian moved the railroad tie toward the van. After that tie was put in the van, Brian and Mr. Kurz would return, and then Brian would stand watch while Justin and Mr. Kurz moved another railroad tie. The rationale for this procedure was to give each boy a rest because of the strenuous activity involved in moving railroad ties and to instill the concept of teamwork into the project.

"23.    Kurz reported as he and Brian Harmon were moving a railroad tie down the tracks, Mr. Kurz looked up and saw a train approaching from the south. Mr. Kurz also stated that he also saw that Justin had left the ditch on the east side of the tracks and was standing, supporting a railroad tie that rested against his shoulder, immediately adjacent to the track. According to Mr. Kurz, both he and Brian Harmon attempted to warn Justin Barnett of the oncoming train by throwing snowballs and waving their arms, but were unsuccessful.

"24.    Justin Barnett was struck by the train and died from the impact."

The Board is the governing body of the KSSD and investigated the above incident. The appointed investigative committee interviewed seven witnesses and issued a report to the Board, outlining the events which occurred. The report also reached several conclusions concerning the three faculty members most involved in the incident. Concerning Marsh, the committee found:

"The Committee believes that Charles Marsh, the owner of the property and a teacher at the school, was the only person who had full knowledge about the nature of the activity. He knew that the students and his colleague, Mr. Kurz, would be moving railroad ties in close proximity to active tracks. He also was

aware that he did not have formal written permission from the railroad to be on that property or to remove ties from it. Mr. Marsh's statement that he was willing to share his land with students and staff of the Kansas School for the Deaf and the community at large notwithstanding, his request to use students to improve personal property was completely inappropriate and not consistent with the School's policy of non-fraternization with students. The Committee believes that Mr. Marsh's conduct throughout the planning and completion of the activity did not reflect the high standards of professional conduct expected of teachers in general, and especially teachers who should be hyper-alert to the safety needs of students who are deaf. Mr. Marsh's failure to fully inform Ms. Ward, the Head Teacher, and other individuals of the nature of the activity when he had several opportunities is inexcusable."

The committee found Chris Kurz, a teacher who assisted Marsh in gathering students and getting permission to do the project, should have cancelled the project immediately when he discovered that it would involve working on and around active railroad tracks. The committee also noted that LuAnn Ward, the Head Teacher of KSSD, should have been alerted to the possible nature of the project when the words "train tracks" were used on the field trip request form and that Ward should have solicited additional information about the project.

The Kansas Commissioner of Education, Andy Tompkins, gave Marsh notice that the Board had adopted a motion to terminate Marsh's contract at KSSD for the following reasons:

"1.    [Marsh] jeopardized the health and safety of two students of [KSSD], as well as [himself] and another staff member, by engaging in an inappropriate and dangerous activity, which resulted in the accidental death of one of those students on March 11, 2000;

"2.    [Marsh] failed to exercise appropriate professional judgment and care regarding student safety in the planning and execution of an activity involving two students of [KSSD], which activity resulted in the accidental death of one of those students on March 11, 2000.

"3.    [Marsh] failed to comply with the school policies, orders and regulations concerning student safety and activities; and

"4.    [Marsh] failed to conduct [himself] in a manner reflecting positively on the school and to maintain the respect and confidence of the other professional employees, students and the employer."

The notice also stated that Marsh had a right to have the matter heard before a hearing committee. Marsh exercised that right.

The hearing committee was composed of former Kansas Attorney General Robert T. Stephan, Washburn School of Law professor William Rich, and Topeka attorney W. Robert Alderson. The parties stipulated to the above-stated facts and presented additional evidence.

The Board called Charles Marsh, Chris Kurz, Brian Harmon, Bill Tappanna (special agent of the Kansas City Railroad), LuAnn Ward, Roberta Burnett (mother of Justin), Richard Whelan, and Andy Tompkins.

Marsh called Kevin Lee Milner, Sr., Sue Qualls, Brian Hedrick, Rebecca J. Rosenthal, Dr. Barbara Luetke-Stahlman, and Herb Shuey.

Highly summarized, other than testimony relating to the accident by Marsh and Kurz, the witnesses for the Board openly criticized Marsh for his decision in organizing an activity which placed a deaf person on an active railroad track.

Marsh's witnesses, who were largely a part of or directly connected with the deaf community, opined that educational experiences for deaf students should in no manner be limited and Marsh's organization of and participation in the railroad tie activity was reasonable under the circumstances.

Marsh testified that he did not feel that he needed permission to take the railroad ties because they were abandoned, another resident had been taking the discarded ties for several years, and Marsh had previously waved to the engineer of passing trains when he had taken ties. The agent for the railroad, Tappanna, testified individuals needed permission to come on the railroad tracks and remove the used ties, although he admitted it was common practice for people to remove the ties without permission because they did not realize it was an act of trespass.

There was direct conflict in the testimony of the other boy at the scene, Brian Harmon, who testified that neither Kurz nor Marsh gave the boys warnings or told them to be careful around the tracks and to look in both directions when approaching the tracks. Kurz and Marsh specifically testified they warned both boys of the danger from trains, and that the person not assisting in mov-

ing a railroad tie had been instructed to remain in the ditch until the tie being moved by the other boy and Kurz had been delivered.

In the final analysis, the Board's witnesses opined that Marsh's actions were dangerous and termination of his employment was justified. Marsh's witnesses testified directly to the contrary—that his actions were not unreasonable and were clearly within what individuals in the deaf community believed to be mainstream practices. The hearing committee resolved this conflict in Marsh's favor.

The hearing committee's decision commented on its scope of authority and found the statutes and case decisions relating to providing tenured teacher due process hearings upon termination or nonrenewal of their contracts, K.S.A. 72-5436 *et seq.*, could be applied to terminations and due process hearings under K.S.A. 76-11a04 *et seq.*

The hearing committee relied on the wording of *Gillett v. U.S.D. No. 276,* 227 Kan. 71, 78, 605 P.3d 105 (1980), to find its purpose was to conduct a hearing that would "afford an opportunity to test the good faith and sufficiency of the notice to terminate Marsh's contract and to ascertain whether good cause exists for the reasons stated in the notice of termination." It was noted that K.S.A. 76-11a10(b) places the burden of proof upon the Board. Also, the Board's reasons for the termination must constitute good cause and its decision must be supported by substantial evidence.

The hearing committee concluded that the essence of the first two reasons for termination given by the Board for the termination of Marsh's employment were similar and characterized Marsh's actions as inappropriate and dangerous and involving the failure to exercise appropriate professional judgment and care as to student safety, thereby jeopardizing the health and safety of two KSSD students, Kurz and Marsh. The hearing committee found the Board's evidence could be placed in three categories: (1) that Marsh failed to properly inform the parents as to the nature of the project, (2) that Marsh did not have permission from the railroad company to remove the ties, and (3) that Marsh improperly organized an activity around an active railroad track.

The hearing committee found there was no evidence Marsh was required to inform the parents of the students who were to participate in the project, as this was the responsibility of the head teacher, LuAnn Ward. The hearing committee stated there was evidence Marsh had not obtained permission from the railroad to use the abandoned ties, but there was no evidence his actions were knowingly violative of railroad rights, as it was common practice for ties to be removed without affirmative railroad approval.

The hearing committee found the Board's evidence did not rise to the level of being substantial evidence of Marsh's lack of professional responsibility. As to the question of whether the removal of the ties was an inappropriate and dangerous activity and showed a failure to exercise appropriate professional judgment, it was noted there was evidence offered by both parties on this issue. The specific testimony to support the opposing positions was not stated, but the hearing committee held that it "believes that the overwhelming weight of the evidence on these points supported Mr. Marsh."

The hearing committee pointed to the lack of a representative of the deaf community on the Board's investigative committee and stated the testimony of such witnesses showed that KSSD undertakes to educate the "entire student" and that the students are taught how to live in the hearing world. The hearing committee found KSSD encouraged students' participation in life activity that many individuals outside the deaf community would believe to be particularly dangerous to deaf students. The hearing committee specifically found and stated:

"On balance, the testimony and evidence offered by representatives of the deaf community found that it was completely acceptable to allow a 15 or 16 year old KSSD student to work on or around train tracks. Witnesses included a professor in deaf education, who is a parent of two deaf children himself, the Executive Director of the Kansas Counsel for the Deaf and Hard of Hearing, who has a hearing child, the parent of a middle-school student at KSSD, a deaf KSSD teacher with a hearing child, a parent of a former KSSD student and a deaf parent of a current KSSD high school student who originally was to participate in the project with Marsh."

The hearing committee found adequate instructions were given to the students regarding train traffic and the execution of the

project. The conflict in the testimony of Brian Harmon and Kurz and Marsh was resolved in favor of adequate planning and warnings being given by the two teachers which had not been followed.

As to reason three, relating to violation of school regulations, the hearing committee found no such regulations existed; thus, it had no relevance to Marsh's actions.

The final reason for termination by the Board related to Marsh's failure to maintain the respect and confidence of other professional employees, students, and employers. It was specifically found that no evidence showed any lack of confidence in Marsh; in fact, the evidence was to the contrary.

The hearing committee then stated:

"[H]aving considered each of the reasons advanced by the Board for terminating the employment of Marsh at KSSD within the context of the evidence and testimony offered at the hearing, the Hearing Committee has concluded that the Board has failed to sustain its burden of proving by substantial evidence that good causes existed for terminating Marsh's employment."

The Board appealed the decision to the district court. The district court found the hearing committee's decision was not supported by substantial evidence and that it was arbitrary and capricious. The court also held the hearing committee erred in adopting a stricter standard than what the Board was operating under and, in doing so, had acted outside the scope of its authority. The court held the Board's conclusion that to excuse Marsh's actions because of Justin's failure to follow instructions was an abuse of discretion that is "so wide off the mark that its unreasonableness lies outside the realm of fair debate."

The court found the hearing committee disregarded undisputed evidence in failing to find the activity Marsh planned was inappropriate and dangerous. The court concluded: "The Hearing Committee changed the standard for the proposed termination of Marsh's employment and then disregarded material undisputed evidence which established the basis for his discharge from employment by the Board."

*Standard of review*

Although the standard of review appeared to be a point of contention before the hearing committee and in the district court, the parties now appear to be in agreement as to this court's standard of review on this issue of first impression.

The KSSD, as well as the Kansas School for the Blind, have separate statutory provisions for termination of teachers and the necessary procedure. See K.S.A. 76-11a04 *et seq.* These statutes have never been directly interpreted by any Kansas appellate court; however, the counterpart statutes generally applicable to all Kansas teachers, located at K.S.A. 72-5436 *et seq.,* have been the subject of numerous decisions of this court and the Court of Appeals. A review of the statutes reveals two major distinctions, neither of which would preclude applying existing tenured teacher caselaw to K.S.A. 76-11a04 *et seq.*

First, K.S.A. 76-11a06 mandates that the KSSD hearings be held before a three-person committee, while K.S.A. 72-5438 now calls for only a single hearing officer. Previously, teacher termination proceedings were heard by three persons. Second, the decision of the three-person hearing committee is only binding on the Board if it is unanimous, while the hearing officer's decision is automatically binding on all parties. K.S.A. 72-5443(b); K.S.A. 76-11a11(b), (c). In all other respects material to this appeal, the statutes are so substantially similar that we may apply the numerous decisions relating to the termination of employment of a tenured teacher.

K.S.A. 76-11a05 requires that a teacher be given written notice prior to termination of his or her contract. K.S.A. 76-11a06 states that the notice must include "(1) a statement of the reasons for the proposed. . . . termination, and (2) a statement that the teacher may have the matter heard by a hearing committee upon written request." The Board in this case gave Marsh notice of termination, specifying four grounds for termination, and Marsh timely requested the matter be heard before a committee.

The procedural requirements to be afforded teachers are enumerated in K.S.A. 76-11a07 and include the right to counsel, cross-examination, and presentation of witnesses and testimony. The

requirements also include "the right of the teacher to a fair and impartial decision based on *substantial evidence*." (Emphasis added.) K.S.A. 76-11a07(f). As further expounded in K.S.A. 76-11a10, which describes the powers of the hearing committee: *"[T]he burden of proof shall initially rest upon the state board* in all instances other than when the allegation is that the teacher's contract has been terminated . . . by reason of the teacher having exercised a constitutional right." (Emphasis added.)

The hearing committee must render a written opinion "setting forth its findings of fact and recommendation as to the determination of the issues." K.S.A. 76-11a11(a). If the decision is unanimous, as it was in our present case, the Board is required to adopt the opinion. K.S.A. 76-11a11(b). The decision, if unanimous, shall be considered final, "subject to appeal to the district court as provided in K.S.A. 60-2101." K.S.A. 76-11a11(b).

K.S.A. 60-2101(d) provides: "A judgment rendered or final order made by a political or taxing subdivision, or any agency thereof, exercising judicial or quasi-judicial functions may be reversed, vacated or modified by the district court on appeal." No standard of review for district courts is specified by statute.

In a recent decision by this court in which we considered the appropriate standard to review a hearing officer's decision under K.S.A. 72-5443 (analogous for all material purposes herein to K.S.A. 76-11a11), the applicable standard of review was clearly pronounced:

" 'The three factors that should have guided the hearing officer in his decision were: (1) The burden of proof was on the school board, (2) the school board's reasons for termination had to constitute good cause, and (3) the decision had to be supported by substantial evidence. See *U.S.D. No. 434 v. Hubbard,* 19 Kan. App. 2d 323, 326, 868 P.2d 1240, *rev. denied* 255 Kan. 1007 (1993).'

" 'The standard of review of a due process hearing officer's decision is limited to deciding if: (1) the hearing officer's decision was within the scope of the officer's authority; (2) the hearing officer's decision was supported by substantial evidence; and (3) the hearing officer did not act fraudulently, arbitrarily, or capriciously. See *Hubbard,* 19 Kan. App. 2d at 326.'

" 'When a district court's decision is appealed, we review the hearing officer's decision as though the appeal has been made directly to us, and we are subject to the same limitations of review as the district court. See *Butler v. U.S.D. No.*

440, 244 Kan. 458, 464, 769 P.2d 651 (1989).' 22 Kan. App. 2d at 894-95." *U.S.D. No. 500 v. Robinson*, 262 Kan. 357, 361, 940 P.2d 1 (1997).

It is also important for our review that the hearing committee held the Board failed to sustain its burden of proof for terminating Marsh's employment. This negative finding requires us to apply our standards of review in light of this additional factor. In *HCA Health Services of Kansas, Inc. v. State Dept. of SRS*, 21 Kan. App. 2d 141, 155, 900 P.2d 838 (1994), in an appeal of an administrative officer's decision, it was held that where a negative finding had been made, "[a]bsent a showing of arbitrary disregard of undisputed evidence or an indication of bias, passion, or prejudice, this negative finding cannot be disturbed. See *Mohr v. State Bank of Stanley*, 244 Kan. 555, 567-68, 770 P.2d 466 (1989)."

*Issues raised by the parties*

The contentions of the parties on appeal before us are predictable. Marsh argues: (1) The hearing committee acted within the scope of its authority in finding the Board did not meet its burden of proof to establish good cause existed for his termination and the hearing committee's decision was supported by substantial evidence and not fraudulent, arbitrary, or capricious, and (2) the district court applied a de novo standard of review and exceeded its authority by reweighing the evidence and substituting its judgment for that of the hearing committee.

The Board counters: (1) The hearing committee erred by not finding Marsh's actions were inappropriate and by imposing a higher standard on the Board for an activity that was inherently dangerous as a matter of law, and (2) the legal issue is whether the hearing committee's unanimous decision to reinstate Marsh's employment contract was arbitrary, unreasonable, or capricious, or not supported by substantial competent evidence, and more pointedly, whether it is wrong for "Kansas school teachers [to put] their students to work on active railroad tracks as a school-related project."

*Analysis*

Although our facts differ from *U.S.D. No. 500 v. Robinson,* the discussion therein is critical to our resolution of the question of whether the hearing committee acted within the scope of authority granted to such a body of the Kansas Legislature. *Robinson* was a tenured teacher termination case where we held the standard of review of a hearing officer remains as established by *Brinson v. School District,* 223 Kan. 465, 469, 576 P.2d 602 (1978), and *Butler v. U.S.D. No. 440,* 244 Kan. 458, 464, 769 P.2d 651 (1989).

In response to U.S.D. No. 500's arguments in the *Robinson* case that if the Board presents substantial evidence to establish good cause, it has met its burden of proof and the hearing officer must accept its decision to nonreview even if the hearing officer would reach a different conclusion, we recounted the history of earlier procedure and stated:

"The 1991 statutory amendment placing the authority to make the final good cause determination in an independent hearing committee (HO after the 1992 amendment) eliminated the conflict of interest the board faced under the earlier procedure.

"The statements in *Gillett* that the district court cannot substitute its judgment for that of the school board, pertained to the board's reviewing authority, not the board's advocacy role, under the earlier statutory procedure. The District's reliance on *Gillett* for the contention that the HO cannot substitute his judgment for that of the school board is misplaced. *K.S.A. 72-5443 gives the HO authority to make the final good cause determination.*" (Emphasis added.) 262 Kan. at 363.

As we have previously stated, the provisions of K.S.A. 76-11a06 through 76-11a11 are comparable to those found in K.S.A. 72-5438 through 72-5445. We conclude that the hearing committee, like a hearing officer, has the authority to make the final good cause determination. The hearing committee determined that "its purpose is to conduct in good faith a fair and just hearing that will afford an opportunity to test the good faith and sufficiency of the notice to terminate Marsh's contract and to ascertain whether good cause exists for the reasons stated in the notice of termination." The hearing committee appropriately recognized its legislative authority, which we recognized in *Robinson,* to make the final determination as to the existence of good cause.

There were four reasons submitted by the Board to support its decision to terminate Marsh's employment.

The third reason was that Marsh failed to comply with the school policies, orders, and regulations concerning student safety and activities. Testimony and evidence failed to show that KSSD had any rules and practices applicable to this situation. This reason was not an issue on appeal from the hearing committee to the district court and is likewise not an issue on appeal to our court that requires consideration except to observe it was considered and properly rejected by the hearing committee.

Likewise, the fourth reason put forth by the Board was that Marsh failed to conduct himself in a manner reflecting positively on the school and to maintain the respect and confidence of the other professional employees, students, and his employer. The hearing committee found and we agree that the Board produced no evidence that showed a loss of confidence in Marsh by any of the employees and teachers. The testimony from members of the deaf community was all to the contrary. Again, this is not an issue on appeal in the proceedings before the district court or in our court. Reasons three and four of the Board's grounds for dismissal were properly found to have no merit.

This causes us to return to reasons one and two, which read as follows:

"1.  [Marsh] jeopardized the health and safety of two students of [KSSD], as well as [himself] and another staff member, by engaging in an inappropriate and dangerous activity, which resulted in the accidental death of one of those students on March 11, 2000;

"2.  [Marsh] failed to exercise appropriate professional judgment and care regarding student safety in the planning and execution of an activity involving two students of [KSSD], which activity resulted in the accidental death of one of those students on March 11, 2000."

The hearing committee characterized these grounds as being similar in scope and substantially alleging that Marsh engaged in inappropriate and dangerous activity and failed to exercise appropriate and professional judgment and care regarding student safety, which jeopardized the health and safety of two students, himself,

and another staff member and resulted in the accidental death of a student on March 11, 2000.

It is important to note that the hearing committee here, as did the hearing officer in *Robinson* found the Board failed to present substantial evidence supporting the stated reasons for nonrenewal. There was evidence supportive of the Board's decision that was presented, but it was the finding of the hearing committee that the Board failed to sustain its burden of proving by substantial evidence that good cause existed for terminating Marsh's employment.

We will not here review each of the specific findings of fact and conclusions of law made by the Board. While reasonable minds could certainly differ in the conclusions reached, "[i]t is not the function of an appellate court to reweigh the evidence; we are concerned only with the evidence which supports the findings below, and not the evidence which might have supported contrary conclusions." *In re Petition of City of Shawnee for Annexation of Land*, 236 Kan. 1, 21, 687 P.2d 603 (1984).

It was shown that while Marsh did not inform the parents of the nature of the project, under the KSSD's procedures that responsibility fell on the office of the head teacher of KSSD. This finding of the hearing committee is supported by substantial evidence.

As to Marsh's failure to have specific railroad company approval for the removal of discarded ties, the hearing committee's conclusion that this did not rise to the level of being substantial evidence of Marsh's lack of professional responsibility was supported by testimony that this was a common practice, the removal is generally done by people who do not realize it is an act of trespass, and Marsh did not believe his actions were inappropriate. We cannot condone an unlawful act, but it was a matter the hearing committee did not view as a sufficient violation of professional judgment and responsibility to justify good cause for termination of employment, and we may not "substitute our judgment for that of the administrative agency or tribunal and may not examine the issue de novo." *Gillett*, 227 Kan. at 79 (citing *Brinson*, 223 Kan. 465).

The question of whether the railroad tie moving project was so inappropriate and dangerous as to show the failure to exercise appropriate professional judgment sufficient to justify termination of

employment was the crux of the decision of the Board and, subsequently, the hearing committee. It was here that the greatest conflict in the evidence and opinions was offered by the Board and Marsh. The hearing committee did not summarize this evidence but found "the overwhelming weight of the evidence on these points supported Mr. Marsh."

Essentially, the Board's witnesses opined that Marsh's project was so ill conceived and so poorly planned and executed that it showed a sufficient lack of professional judgment and care such that termination of employment was the appropriate sanction.

Marsh's evidence discounted his obligation to the parents by placing KSSD's administration between himself and the parents. He then presented the view of what can be classified as the "deaf community" — that there should be no limitation in how nonhearing students are taught to live in the hearing world.

This testimony came from a professor in deaf education who is the parent of two deaf children, the Executive Director of the Kansas Council for the Deaf and Hard of Hearing who has a hearing child, the parent of a middle school student at KSSD, a deaf KSSD teacher with a hearing child, a parent of a former KSSD student, and a deaf parent of the current KSSD high school student who was originally to participate in the project with Marsh. This group's unanimous testimony and opinion was to the effect that Marsh's actions were well within the parameters of activities for a nonhearing student of high school age.

The hearing committee resolved the direct conflict in the evidence concerning the instructions and warnings to the two participants by finding that adequate instructions were given and, had the plan devised been followed, the project would have been safely carried out. We have great concerns over these conclusions, but we cannot reach a contrary result without abandoning our required standard of review and making contrary findings of fact by reweighing the evidence. As we have said previously on numerous occasions in this opinion, we do not have the legal right to redetermine these questions de novo. The evidence *was* conflicting, and the opposite result could certainly have been reached. But, it was not, and giving the finder of fact the consideration to which it

is entitled, we must not substitute our judgment for that of the hearing committee.

The hearing committee did act within the scope of its legislatively designated authority. It properly set forth its authority and obligations and followed the dictates of *Gillett, Hubbard,* and *Robinson.*

The hearing committee's usage of the phrase "inherently dangerous" did not change the scope of its authority from the "inappropriate or dangerous" language which the Board used in its notice of termination to Marsh. The hearing committee said: "While the removal of railroad ties from land adjacent to active tracks might be considered inappropriate for any organized student activity, it was not so inherently dangerous as to preclude reasonable differences of opinion regarding that issue." Whether the actions of Marsh were considered to be inherently dangerous or inappropriate and dangerous appears to be a matter of semantics and does not require reversal of the hearing committee and approval of the district court's contrary finding and result.

The hearing committee fully discussed and reviewed the four stated reasons for dismissal. It did not ignore undisputed evidence, although it did find and hold that the Board had failed to sustain its burden of proving by substantial evidence that good cause existed for terminating Marsh's employment.

It is not our place to decide cases such as this one as if we were members of the hearing committee. We are obligated by our standard of review, which requires us to decide:

(1) Whether the hearing committee's unanimous decision was within the scope of its authority. We find that it was.

(2) Whether the hearing committee's decision was supported by substantial evidence. The evidence was conflicting, but these conflicts were resolved by the hearing committee and there *was* substantial evidence to justify its opinion.

(3) Whether the hearing committee acted fraudulently, arbitrary, or capriciously. The hearing committee conscientiously heard testimony for 2 days from 14 different witnesses. We can find nothing which compels a finding of any fraudulent, arbi-

trary, or capricious action and would require the reversal of its decision.

There is no way anyone can have any positive thoughts or feelings about the tragic facts of this case. But, the procedure established by the Kansas Legislature in K.S.A. 76-11a04 *et seq.* was followed, and based on our standard of review under the facts and circumstances of this case, we are required to uphold the decision of the hearing committee.

Under *Butler* and *Robinson,* we make our review as though the appeal has been made directly to us. We have done so. We do not comment on or review each finding and conclusion of the district court.

The decision of the district court is reversed. The decision of the hearing committee is affirmed.