No. 98,342

DAVENPORT PASTURES, LP, *Appellant*, v. MORRIS COUNTY BOARD OF COUNTY COMMISSIONERS, *Appellee*.

(238 P.3d 731)

Opinion filed September 10, 2010.

*Greer S. Lang*, of Lawrence, argued the cause, and *Charles R. Rayl* and *Douglas P. Jones*, of Rayl & Jones, LLC, of Cottonwood Falls, were with her on the briefs for appellant.

*William A. Kassebaum*, county counselor, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

NUSS, J.: This is an appeal of damages awarded to Davenport Pastures, LP (Davenport), by the Morris County Board of County Commissioners (Board). Davenport claims it was denied due process by the county counselor's dual roles as the Board's legal advisor and as the Board's advocate during and after the damages hearing process. After the district court and the Court of Appeals

affirmed the Board, we granted in part Davenport's petition for review under K.S.A. 20-3018(b).

We hold Davenport's due process rights were violated. Accordingly, we reverse the decisions of the Court of Appeals, the district court, and the Board and remand to the Board for further damages proceedings.

FACTS

On February 9, 2000, Davenport filed a written application for damages with the Morris County Board of County Commissioners. Davenport sought damages arising from the Board's decision to vacate two roads that provided access to Mulvane Ranch, which Davenport leased. Without conducting a hearing, the Board directed Assistant County Attorney William Kassebaum to draft a letter on its behalf rejecting Davenport's application. All three commissioners signed the letter.

Davenport appealed to the district court, where Kassebaum represented the Board. The court conducted an evidentiary damages hearing, where Kassebaum called witnesses for the Board, cross-examined Davenport's expert witnesses, and made arguments to the court. The district court ultimately awarded Davenport $30,000.

The Board appealed, and Kassebaum made its arguments to the Court of Appeals. That court determined that the district court's decision to conduct an evidentiary hearing exceeded the scope of its judicial review under K.S.A. 60-2101(d) because the Board had never conducted a hearing or found that any damages should be awarded. The panel remanded to the district court with instructions to return the case to the Board for further compensation proceedings. *Davenport Pastures, LP v. Board of Morris County Comm'rs*, 31 Kan. App. 2d 217, 225, 62 P.3d 699, *rev. denied* 276 Kan. 967 (2003) (*Davenport I*).

On remand, Kassebaum met with the Board's three commissioners and advised them of the need for a damages hearing and the accompanying procedural requirements. At oral arguments before this court, he represented that nothing was discussed regarding standards or how to evaluate the evidence. Kassebaum also

separately took two commissioners to view the two roads. One of these two commissioners, Jerry Britt, also twice reviewed the roads independently. He later testified in his deposition that these un-accompanied viewings "helped me agree with some of the testi-mony that I had heard."

Commissioner F.J. Revere testified in his deposition that "we needed to hire" an appraiser because Davenport had one. Kasse-baum recommended the Board hire David Sundgren as its ap-praiser and expert witness. Commissioner Darrell Miller testified in his deposition that Sundgren was hired after Kassebaum de-scribed Sundgren as "credible."

During the Board's damages hearing, Davenport's two attorneys presented evidence through two appraisers and sought $382,965 in damages. Kassebaum was the only other legal counsel present. He cross-examined Davenport's two expert witnesses, conducting voir dire on one. He also directly examined the Board's appraiser Sundgren, who opined total damages of only $4,050. Kassebaum also made oral arguments to the Board, including comments on the evidence. Commissioner Revere later testified in his deposition that he viewed Davenport as an adversary and that both Kassebaum and Sundgren represented the Board at this hearing.

The Board took the matter under advisement. In the following weeks, Davenport's possible damages award was discussed at a minimum of five open Board meetings. It is undisputed that Kas-sebaum was present at some of these meetings. Commissioner Mil-ler acknowledged in his deposition that Kassebaum sometimes "was present when we discussed the damages" and clarified Kas-sebaum's involvement during the following colloquy:

"Q: Do you recall discussing any of the evidence with Mr. Kassebaum?
"A: Well, he being our attorney I'm sure we discussed some things with him.
"Q: What kinds of things did you discuss?
"A: I don't recall the specifics.
"Q: Did you talk with him about how you ought to view the evidence?
"A: No.
"Q: Did you talk with him about which witnesses were credible and which witnesses weren't credible?
"A: No, no.

"Q: Did you talk with him about what you ought to award as far as a damage amount?

"A: Not to Mr. Kassebaum."

Kassebaum advised the commissioners to individually review the evidence. During a later Board meeting, he instructed the Board members to "[w]rite down on a piece of paper wh[at] you think the damages are." Each commissioner then individually provided his damages figure to Kassebaum, who in turn, presented the results to the Board at the next open meeting. Because all three commissioners had calculated different damages figures, Kassebaum instructed the Board to discuss the matter and arrive at a final damages award. Commissioner Miller testified in his deposition about these events:

"Q: Now, you indicated that during this public meeting where Mr. Kassebaum came back and reported to you on what each of you had voted on, that there was some discussion amongst the three of you—

"A: Uh-huh.

"Q: —to resolve—to come to a final number, correct?

"A: Correct.

"Q: And was Mr. Kassebaum present at the time you had that conversation?

"A: I don't recall if he was there or not. I assume he probably was when we were discussing it, since he's our counselor."

Commissioner Britt similarly testified in his deposition:

"Q: You communicated the [damages] number to him [Kassebaum], you think you may have discussed some of the evidence in front of him, correct?

"A: That's the way I remember it."

Ultimately, the Board decided to award $4,050 in damages: the amount opined by the Board's hired appraiser Sundgren. However, this decision was not immediately communicated to Davenport. Instead, the Board directed Kassebaum—without Davenport's knowledge—to write the Board's formal decision, subject to Board review.

The record is unclear on whether Kassebaum was merely a scrivener for the Board, i.e., he only recorded the Board's specific findings, or whether he independently made some findings and included them in the Board's report as its own. The following

deposition colloquies between Commissioner Miller and Davenport's counsel illustrate the mix:

"Q: You resolved—came to an agreement on a number for the damages?

"A: Yes.

"Q: What happened next?

"A: Once we agreed upon a number then the—we directed Mr. Kassebaum to come up with—or prepare the damage assessed and he prepared that and give to use for review.

"Q: Did you tell Mr. Kassebaum what he should say in that document or award, or you just told him 'This is the number we agreed on'?

"A: Well, that's the number agreed on, and he went and prepared it and brought it back for our review, and then there were changes made. I think we had three or four different drafts that was made before the final draft was approved.

"Q: Did you direct Mr. Kassebaum that he needed to write a decision, that you needed—

"A: We didn't—I think that's part of the hearing process, but I do not know that. That was just something that we had to have a damage done in response, I assume.

"Q: Okay. And the Board members told Mr. Kassebaum 'This is the number we agreed on'?

"A: Yes, and then he prepared it.

"Q: Did you rely on him to prepare the decision?

"A: Oh, no. You mean as far as the damage discussion.

"Q: No, not the dollar amount. I understand the Commissioners voted on that dollar amount and they told Mr. Kassebaum what the dollar amount was. My question is whether or not the Board relied on Mr. Kassebaum to write the written decision that was ultimately issued that incorporated the damage amounts the Board voted?

"A: Yes, we relied on him.

"Q: Okay. Did you tell him what that decision needed to say?

"A: I don't think we did, because I don't think we knew what was supposed to be in it as far as the specifics as far as the request of the Court, because I—we don't know how to write legal documents, so we relied on him to do that.

. . . .

"Q: Or did you rely on him to say the things that needed to be said?

"A: We instructed him on the substance and then he prepared as far as putting it down in writing.

. . . .

"Q: . . . But what I want to know is, were those things that you openly discussed during those regular open public meetings of the Board, and Mr. Kassebaum was there taking notes and taking it up and regurgitated it in a document, or did you do as you previously said, told Mr. Kassebaum 'This is the number we agreed on,

go write—whatever we have to write, write it for us,' and then you reviewed it and made some chances to it and ultimately adopted it?

"A: That's—we—there were things in here [the final report] that we discussed in an open meeting. Mr. Kassebaum was present when we discussed the damages, and he wrote—he put the stuff in the document that—because we didn't know how to prepare a document—

"Q: Uh-huh.

"A: —because that's his expertise and not ours, so he put our feelings down in a document, I think."

After Kassebaum made a few changes to his initial draft at the Board's request, the decision was published and signed by the three commissioners. Davenport and its counsel were never given an opportunity to review, provide input, or object to Kassebaum's work. Apparently, the first time Davenport or its counsel learned of the Board's decision on damages was when they received the final written report.

Davenport appealed the Board's $4,050 damages award to the district court, where Kassebaum again represented the Board. The court granted the Board's motion for summary judgment on all issues. On Davenport's specific claim of a due process violation due to Kassebaum's dual roles, the court held:

"Regarding the county counselor's involvement in this case: The court has made a finding based upon the record that the County Counselor, Mr. Kassebaum, participated in the damage hearing in this case. He questioned witnesses called by the plaintiff and he called witnesses to testify about the value of the loss to the plaintiff. There is no evidence that he participated in the deliberations of the board regarding damages. He did put to writing the decision of the board as to damages. His participation was well within the bounds of proper conduct. There is no evidence that he influenced the board's decision."

Davenport appealed the district court's decision, and Kassebaum again made the Board's arguments to the Court of Appeals. The panel affirmed, holding that Kassebaum's dual participation did not deny Davenport's right to due process because Davenport failed to present "evidence that an attorney's action in representing a board at a quasi-judicial hearing as well as advising the Commission has *actually affected* the Commission's decision." (Emphasis added.) *Davenport Pastures v. Board of Morris County Comm'rs,* 40 Kan. App. 2d 648, 655, 194 P.3d 1201 (2008) (*Davenport II*).

More facts will be added as necessary to the analysis.

ANALYSIS

Issue: *The county counselor's multiple roles deprived Davenport of due process.*

*The parties' arguments*

Davenport claims that Kassebaum's dual roles should not have been allowed. Specifically, Davenport argues it was denied due process by Kassebaum's advocating against its application for damages, while—in its absence—Kassebaum also advised the Board on legal and procedural matters, including drafting the Board's decision.

Davenport further contends that the district court and Court of Appeals both erred in requiring a due process violation to be proved by the dual representation's causing actual bias, *i.e.*, actually influencing or affecting the Board's decision. Instead, Davenport should have only been required to demonstrate that the dual roles created an appearance of impropriety or bias. Davenport argues that it made this lesser showing and therefore the Board's decision must be declared void.

The Board responds that Kassebaum did not act as a legal advisor for the Board during the damages hearing. The Board admits that consistent with Kassebaum's role as county counselor, he was present during the Board meetings, including those where Davenport's damages were discussed. However, Kassebaum "took care not to partake or advise the Board during their discussions." Kassebaum admits to writing the Board's decision but characterizes his involvement "as a scribe for the Board."

*Standard of review*

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . deprived of . . . property, without due process of law, nor shall private property be taken for public use without just compensation." This right is applied to the states through the Fourteenth Amendment to the United States Constitution. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 481 n.10, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987). This

right can include the right of access. *Smith v. State Highway Commission*, 185 Kan. 445, 451, 346 P.2d 259 (1959) (The right of access held by a property owner whose property abuts a public road is "property of which he may not be deprived without his consent, except on full compensation and due process of law.").

"It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009). This principle applies to administrative agencies which adjudicate as well as to courts. *Withrow v. Larkin*, 421 U.S. 35, 47, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975). A denial of due process renders the resulting Board decision void. See *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, 947, 218 P.3d 400 (2009). Whether a right to due process has been violated is a question of law over which this court exercises unlimited review. *State v. Holt*, 285 Kan. 760, 774, 175 P.3d 239 (2008); see also *City of Wichita v. McDonald's Corp.*, 266 Kan. 708, 971 P.2d 1189 (1999) (reviewing, de novo, whether a regulation of traffic flow to and from private property was a compensable taking).

*Discussion*

The district court concluded that "[t]here is no evidence that [Kassebaum] influenced the board's decision." The Court of Appeals essentially agreed. It concluded that the "evidence shows the Commission complied with the requirements of due process. Its proceeding was fair, open, and impartial, as required by Kansas law." 40 Kan. App. 2d at 655. More specifically, the panel cited two cases to support its holding that for Davenport to prove a due process violation, it must show that Kassebaum's dual roles actually affected the Board's decision, *i.e.*, it must show actual bias. 40 Kan. App. 2d at 655 (citing *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 361-62, 770 P.2d 423 [1989]; *Colorado Motor Vehicle v. Northglenn*, 972 P.2d 707, 711 [Colo. App. 1998]).

The panel outlined the facts and holdings of three cases cited by Davenport but dismissed them by stating that "[n]o Kansas appellate court has adopted any of the rules found in Pennsylvania

and California." 40 Kan. App. 2d at 653-54 (discussing *Horn v. Township of Hilltown,* 461 Pa. 745, 748, 337 A.2d 858 [1975] [due process rights may be violated if there is an appearance of impropriety]; *Newtown Tp. Bd of Sup'rs v. Gr. Media,* 138 Pa. Commw. 157, 162, 587 A.2d 841 [1991] [stating that when a municipal governing body acts in an adjudicative role it must "avoid not only actual bias, but also even the appearance of bias or impropriety"]; and *Quintero v. City of Santa Ana,* 114 Cal. App. 4th 810, 817, 7 Cal. Rptr. 3d 896 [2003] [totality of circumstances gave appearance of bias and unfairness sufficient to show probability of actual bias]). We disagree with the panel's general conclusion, for reasons explained below.

In *Kansas Racing Management,* 244 Kan. 343, the appellants challenged the denial of a racetrack license by the Kansas Racing Commission. Among other things, appellants alleged a conflict of interest because of the relationship between a successful applicant and the attorney general. A subpart of this argument and the court's approach merit setting them forth in detail:

> "Finally, we must also reject appellants' allegation that, since the attorney general is the statutory head of the KBI, this relationship tainted the KBI investigations as well as the conduct of the two assistant attorneys general assigned as counsel to the Commission. *We note that appellants rely on an 'appearance of impropriety' argument and present no facts to substantiate their allegations, specifically how the alleged bias influenced any of the five Commission members.* Appellants have failed to recognize that the legislature specifically directed the attorney general to appoint 'not more than two assistant attorneys general who shall be assigned to assist the commission in all matters.' K.S.A. 1988 Supp. 74-8809. In addition, pursuant to the Kansas Code of Professional Responsibility, those assistant attorneys general who were appointed to assist the Commission are solely responsible to the Commission. We find this contention to be without merit." (Emphasis added.) 244 Kan. at 361-62.

The *Kansas Racing Management* court rejected appellants' claim that an appearance of impropriety existed. But its language fails to make clear whether the court rejected appellants' legal standard of an appearance of impropriety ("appellants rely on an 'appearance of impropriety' argument"); or whether the court simply found insufficient evidence to support that standard (appellants "present no facts to substantiate their allegations, specifically how the al-

leged bias influenced any of the five Commission members."); or whether the court determined something else, *e.g.,* a specific standard higher than the mere appearance of impropriety ("alleged bias influenced" the Commission). Accordingly, we cannot agree with the *Davenport II* panel that *Kansas Racing Management's* holding absolutely requires Davenport to prove a due process violation by showing that bias actually affected the Board's decision, instead of merely showing the appearance of impropriety.

In the panel's second case cited in support, *Northglenn,* 972 P.2d 707, we acknowledge that the Colorado Court of Appeals stated that "we do not agree that evidence of a potential bias on behalf of an agency's staff member alone is sufficient to rebut the presumption of a board's impartiality." 972 P.2d at 711.

But neither *Northglenn* nor *Kansas Racing Management* squarely fits the facts of this case—a single attorney simultaneously acting as the Board's legal advisor and as the Board's advocate in the same matter. We instead find considerable parallels to the instant case in the Kansas "unacceptable dual roles" case of *Coats v. U.S.D. No. 353,* 233 Kan. 394, 662 P.2d 1279 (1983). It was not cited by the court in *Kansas Racing Management* or by the instant case's panel or parties.

Leota Coats was a teacher who challenged the school board's resolution expressing its intent to nonrenew her teaching contract for the upcoming school year. Coats exercised her right to dispute the Board's intended action via a due process hearing under the Teacher Tenure Law, K.S.A. 72-5436 *et seq.* One provision of the Law, K.S.A. 72-5438, permitted the teacher and the school board to each select one person to serve on the hearing committee for the required "fair and impartial decision." Those two persons then would designate a third person who served as the chairperson.

In *Coats,* a hearing committee was impaneled, and it ultimately recommended by a two-to-one vote that Coats' contract be nonrenewed. Although the school board was not statutorily required to follow the committee recommendation, it did so. Its earlier intent to nonrenew Coats' contract became an actual nonrenewal.

Coats appealed the nonrenewal to the district court. She alleged, *inter alia,* a deprivation of due process because of the school

board's selection of its own attorney to serve on the hearing committee. The district court agreed she was denied a fair and impartial decision, and we unanimously affirmed. We concluded:

"[T]he school board's appointment of its own attorney to the hearing committee violated the rule of fundamental fairness. In a situation such as this *the school board attorney has a conflict of interest. He is the person who prepared all the documents and gave the school board its legal counsel in arriving at its decision to nonrenew the teacher. Further, he has an obvious financial interest in confirming the school board's decision.* Such a blatant defiance of due process cannot be countenanced. We hold the school board's appointment of its own attorney to the hearing panel violated Ms. Coats' right to due process." (Emphasis added.) 233 Kan. at 403.

Although the *Coats* opinion is unclear, "all the documents" the school board's attorney prepared apparently referred to those involving the board's initial resolution of its intent to nonrenew. Similarly, while the opinion is unclear, the attorney's giving "the school board its legal counsel in arriving at its decision to nonrenew the teacher" apparently referred to his advice regarding passage of the initial resolution of intent to nonrenew. As for counsel's "obvious financial interest in confirming the school board's decision," the opinion implies that if he as a committee member did not later vote to recommend nonrenewal, then the board would terminate his general legal services contract with the district.

*Coats* does not mention the teacher making an evidentiary showing of actual bias, *i.e.*, the attorney's dual roles actually affecting the board's decision. Nor, admittedly, does the opinion mention the teacher showing only the appearance of impropriety. Rather, the *Coats* court appears to draw conclusions that it believed were self-evident from the facts. First, the school board attorney "clearly" had a conflict of interest by initially giving legal counsel to the board so it could make a determination of intent to nonrenew but then later being asked to impartially make a recommendation on the nonrenewal issue as a committee member. See *Leaming v. U.S.D. No. 214*, 242 Kan. 743, 754, 750 P.2d 1041 (1988) (in discussing *Coats*, court concluded that "a school board attorney *clearly* has a conflict of interest"). Second, the Board's attorney has

an "obvious" financial interest in later agreeing with the Board's initial resolution.

The *Leaming* court applied *Coats*. It concluded, however, that the school board's appointment of a teacher due process hearing committee member, while a treasurer for the school board and a local attorney, did not violate due process. That is because his treasurer's duty was limited to transferring funds, he received no pay for his treasurer services, and he was not an attorney or legal advisor for the school board. The *Coats* standard has also been applied outside the education field. See *Pork Motel, Corp. v. Kansas Dept. of Health & Environment*, 234 Kan. 374, 383-84, 673 P.2d 1126 (1983) (KDHE investigation and hearing on whether Pork Motel violated state environmental pollution laws).

Even before this court's 1983 decision in *Coats*, we criticized an attorney's dual roles in the same matter: first as quasi-judicial officer, then as advocate. In *Powers v. State Department of Social Welfare*, 208 Kan. 605, 493 P.2d 590 (1972), the State Department of Social Welfare appointed a lawyer from its own legal staff as the referee to preside over a "fair hearing" to hear Powers' appeal from denial of welfare benefits. The referee eventually recommended continued denial because, due to Powers' refusal to have a medical examination, there was insufficient evidence to conclude whether she was disabled. The Department then appointed the same lawyer to represent it at the district court when Powers appealed there.

Powers' appeal was denied as a matter of law because of her undisputed failure to submit to a medical examination in accordance with regulations, as the referee had basically found. Nevertheless, the court stated that if her appeal had involved issues of fact, "grave issues of due process of law may well have justified a reversal of this case and a new trial." 208 Kan. at 619. The *Powers* court found the attorney's dual roles "highly improper" and his role as advocate was "clearly in conflict" with his former quasi-judicial position. 208 Kan. at 619. It then expressed the depth of its distaste for these particular dual roles: "We wish to make it clear that in the future a procedure which permits a referee or other quasi-judicial officer to represent a party in subsequent proceedings in the same case *will not be sanctioned by this court*." (Em-

phasis added.) 208 Kan. at 620; see *Goertzen v. State Department of Social & Rehabilitation Services,* 218 Kan. 313, 321, 543 P.2d 996 (1975) (citing *Powers* to direct that no one person could serve both these roles).

Although the *Coats* court in 1983 did not cite *Withrow,* 421 U.S. 35, *Coats'* rationale is consistent with the following statement from *Withrow:*

"Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even *the probability of unfairness.'* [Citation omitted.] In pursuit of this end, various situations have been identified in which experience teaches that *the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable."* (Emphasis added.) 421 U.S. at 47.

This statement from *Withrow* remains a valid basis for considering the presence of biased decisionmaking. Just last year it served as the principal foundation for the United States' Supreme Court's decision in *Caperton,* 556 U.S. 868. There, on a 3-2 vote, the West Virginia Supreme Court reversed Caperton's $50 million jury verdict against Massey and its affiliates. Caperton claimed a violation of due process because one justice in the majority had denied a recusal motion against him. More particularly, the motion alleged that the justice had received an extraordinarily large campaign contribution "from, and through the efforts of, the board chairman and principal officer" of Massey. 556 U.S. at 872. The Supreme Court essentially agreed, holding:

"Under our precedents there are objective standards that require recusal when 'the *probability of actual bias* on the part of the judge or decisionmaker is too high to be constitutionally tolerable.' *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975). Applying those precedents, we find that, in all the circumstances of this case, due process requires recusal." 556 U.S. at 872.

The *Caperton* Court made clear that it was not "determin[ing] whether there was actual bias" by the West Virginia justice. 556 U.S. at 882. It was instead concluding under the case's extreme facts that "the probability of actual bias rises to an unconstitutional level." 556 U.S. at 887; see 556 U.S. at 890 (Roberts, C.J., joined by Scalia, Thomas, and Alito, JJ., dissenting) ("Today . . . the Court

enlists the Due Process Clause to overturn a judge's failure to re-cuse because of a 'probability of bias.' ").

In *Coats*, the hearing committee's two-to-one decision statuto-rily had only been a recommendation to the school board, which reserved final decisionmaking authority. Accordingly, Coats' ability to show that the attorney's dual roles had prejudiced her by af-fecting the Board's nonrenewal decision was complicated by the fact that the Board could have ultimately rejected the committee recommendation and voted to renew her contract. Indeed, the opinion appears to assume the attorney had been one of the two committee members to recommend nonrenewal. However, this fact had little, if any, impact on the *Coats* court decision: "Even though it only results in a recommendation to the school board, the due process hearing is an integral part of the actual decision regarding nonrenewal. Fundamental fairness is thus necessarily ap-plicable." 233 Kan. at 403.

This factual scenario can no longer exist in teacher due process contexts. In 1984, the year after *Coats*, the legislature amended the appropriate statute to make a unanimous recommendation by the hearing committee binding on the school board. And then in 1991, the legislature again amended the statute to make all deci-sions by the hearing committee, whether unanimous or not, bind-ing on the board. Finally, in 1992, the legislature once again amended it to replace the hearing committee with a single hearing officer. See *U.S.D. No. 500 v. Robinson*, 262 Kan. 357, 360, 940 P.2d 1 (1997).

The *Robinson* court recognized that the school board originally functioned in a dual and conflicting capacity by acting "as its own advocate at the due process hearing and the reviewer of its own decision after the hearing committee made its own recommenda-tion." 262 Kan. at 363. The court acknowledged that the 1991 amendment—placing the authority to make the final good cause determination in an independent hearing committee (hearing of-ficer after the 1992 amendment)—eliminated the dual roles and the board's conflict. 262 Kan. at 363.

Based upon this review of Kansas law, we conclude that while Kansas courts and the legislature have due process concerns about

dual roles, the mere appearance of impropriety is insufficient to constitute a due process violation. See, *e.g.*, *Leaming*, 242 Kan. at 753-54 (under facts of case, the school board's appointment of teacher due process hearing committee member, although treasurer for the board and a local attorney, did not violate teacher's due process; committee member received no treasurer's pay and was not attorney or legal advisor for school board); *Pork Motel*, 234 Kan. at 384 (under facts of case, KDHE engineer's service as one of two KDHE hearing officers for certain proceeding did not violate due process; engineer was not connected with KDHE's investigation and decision to institute administrative proceedings against Pork Motel; his function at hearing was more of technical advisor to other hearing officer who was an outside attorney).

Rather, we clarify the standard and rationale inherent in *Coats* (where the attorney's conflict of interest was clear and his financial interest in confirming the Board's decision obvious) and in its progeny. That is, due process is violated when, under all the circumstances of the case, the "probable risk of actual bias [is] too high to be constitutionally tolerable." *Withrow*, 421 U.S. at 47. As the Supreme Court recently stated in *Caperton*: "Under our precedents there are objective standards that require recusal when 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable'" and "in all the circumstances of this case, due process requires recusal." 556 U.S. at 872.

Now that we have established the appropriate standard, we apply it to the facts of this case. We begin by observing that Kassebaum apparently has represented the Board in virtually all Davenport matters since Davenport's first damages application in 2000 and continuing through today, 10 years later. We conclude that under all the circumstances of this case, Kassebaum's multiple roles make the probable risk of actual bias to Davenport too high to be constitutionally tolerable.

In Kassebaum's first role, as the Board's primary, if not sole legal advisor, he drafted the letter rejecting Davenport's initial application for damages; advised the Board on how to schedule and conduct the damages hearing upon remand from the Court of Appeals

in *Davenport I*; recommended the appraiser that the Board eventually hired as its sole expert witness for its damages hearing; instructed the Board on how to proceed after its damages hearing; compiled the three individual damages figures from all commissioners and presented them at a Board meeting; advised the commissioners to agree on one damages figure; received the one damages figure from the Board; and arguably served only as scribe in drafting the Board's written decision.

In Kassebaum's second role, as the Board's sole advocate, he represented the Board at all court proceedings against Davenport. These included two appearances in the district court (including an evidentiary damages hearing), two appearances in the Court of Appeals, and one in this court. Consistent with this role, he also asserted the attorney-client privilege in an attempt to prevent Davenport's unrestricted depositions of the three commissioners. More important, during the Board's own damages hearing, he commented on and argued against Davenport's evidence; cross-examined both of Davenport's expert witnesses; and called witnesses to testify and directly examined them, including the Board's damages expert.

We also note that some of Kassebaum's functions in these two conflicting roles seep into a third role: adjudicative. Before the damages hearing, Kassebaum individually transported two of the three commissioners, in Davenport's absence, to view the roads at the heart of the damages dispute; advised the Board, in Davenport's absence, that appraiser Sundgren should be hired because Kassebaum thought him credible; and was physically present, again while Davenport was absent, during some of the Board's discussions about Davenport damages. Moreover, he arguably served as more than a scribe in drafting the Board's written decision.

Most persuasive in Davenport's establishing "the probable risk of actual bias" by Kassebaum's multiple roles is the amount of the Board's ultimate damages award and the sequence of events leading to its determination. While in the Board's employ, Kassebaum recommended Sundgren as the credible appraiser to serve as the Board's expert witness on damages. The Board then hired Sundgren, who testified at the Board's damages hearing under Kasse-

baum's direct examination. These combined factors may have been why Commissioner Revere believed that Sundgren and Kassebaum both represented the Board at the hearing. Sundgren's testimony revealed he strongly disagreed with the Davenport's experts' damages calculations of $382,965. Rather, he opined the damages were only $4,050, almost 100 times less. When Kassebaum examined the three commissioners' individually different damages awards, he advised them to discuss the matter and agree on one final award. They later decided upon damages of $4,050: the amount, to the dollar, testified to by their expert retained on Kassebaum's recommendation. Moreover, it is undisputed that Kassebaum had at least been in the same room at some of the five meetings where the Board had discussed Davenport's damages. See *Loewen v. U.S.D. No. 411*, 15 Kan. App. 2d 612, 621, 813 P.2d 385 (1991) (despite testimony indicating school board made an independent decision because nonmembers present were not asked for their opinions, court held presence of "antagonistic or unnecessary parties to the executive session . . . smacks of unfairness to the teacher whose rights are being considered"). Finally, Commissioner Miller's testimony suggests that some of the evidence may have been discussed with Kassebaum.

Additionally, after receiving the final damages figure from the Board, Kassebaum then drafted the Board's report without the knowledge of, or input from, Davenport. The evidence from commissioners is unclear on whether Kassebaum only recorded the Board's findings or wrote some of his own. We observe that it has been held to be a denial of due process for a prosecuting attorney to draft ex parte the findings of fact and conclusions of a commission because that practice constitutes an impermissible commingling of prosecutorial and adjudicative roles. See, *e.g.*, *Georgia Gulf Corp. v. Bd. of Ethics*, 694 So. 2d 173, 176 (La. 1997) (discussing *Allen v. State Bd. of Dentistry*, 543 So. 2d 908, 915-16 [La. 1989]). Even given the Board's position on appeal that Kassebaum was merely a scribe, *i.e.*, he provided no input of his own into the report, we further observe that this procedure followed by Kassebaum and the Board is atypical of Kansas requirements, at least in the district courts. More specifically, a district court may announce

its holding to all parties and order one party or its counsel to journalize the decision. That party prepares the journal entry and submits it to the opposing party under Supreme Court Rule 170 (2009 Kan. Ct. Annot. 245) (relating to district courts) which has 10 days in which to object. If counsel cannot agree, then if necessary the court settles the issue by hearing with notice to all parties and counsel.

In short, the Board requested Kassebaum to advocate/investigate on the amount of damages (if any); to advise on legal procedures; and arguably to also help adjudicate, particularly with the drafting of the order. In our view, Kassebaum was improperly asked to be, if not "A Man for All Seasons," then a man for too many seasons. As in *Powers*, "the court wishes to make it clear that it is not questioning the integrity" of Kassebaum. 208 Kan. at 619-20. Rather, we disagree with the various roles he was asked to play in the Board's Davenport production.

Given that our holding is based upon case law from the United States Supreme Court and Kansas, we merely note, but do not discuss, Davenport's cited cases from other jurisdictions. See, *e.g.*, *Matter of Robson*, 575 P.2d 771 (Alaska 1978); *Hamilton v. City of Mesa*, 185 Ariz. 420, 916 P.2d 1136 (Ariz. App. 1996); *Morongo Band of Mission Indians v. State Water Resources Control Bd.*, 45 Cal. 4th 731, 88 Cal. Rptr. 3d 610, 199 P.3d 1142 (2009); *Newtown Tp. Bd. of Sup'rs v. Gr. Media*, 138 Pa. Commw. 157, 587 A.2d 841 (1991); *Horn v. Township of Hilltown*, 461 Pa. 745, 337 A.2d 858 (1975); *Nova Services, Inc. v. Village of Saukville*, 211 Wis. 2d 691, 565 N.W.2d 283 (Wis. App. 1997).

Accordingly, we reverse the decisions of the Court of Appeals, the district court, and the Board. The case is remanded to the Board with directions for further damages proceedings consistent with this opinion.

BEIER, J., not participating.

ROBERT W. FAIRCHILD, District Judge, assigned.

* * *

BILES, J., concurring: I agree Davenport's due process rights were violated. I also agree with the court's analysis that inevitably leads to this conclusion. I write separately only to emphasize that under these facts and the statute directing these proceedings, this was not a close case.

From the outset, it must be recognized that K.S.A. 68-102a necessarily creates an inherent conflict of interest for county commissioners. On the one hand, the statute charges commissioners with determining the monetary damages owed by their county to a private citizen whose land abuts a public roadway now abandoned by the county. On the other, the commissioners have statutory authority over county budgets and taxing policies, which may be significantly impacted by such a dispute. See K.S.A. 19-212 (authorizing county commissioners to examine and settle all accounts, apportion and levy taxes, and manage a county's business concerns).

These statutes undoubtedly put commissioners in the near impossible position of trying to be good stewards of their county's finances, while at the same time ensuring the private landowner receives what basic due process rights demand—a fair trial in a fair tribunal. See *In re Murchison*, 349 U.S. 133, 136, 99 L. Ed. 942, 75 S. Ct. 623 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. . . .[O]ur system of law has always endeavored to prevent even the probability of unfairness."); *McPherson Landfill, Inc. v. Board of Shawnee County Comm'rs*, 274 Kan. 303, 305, 49 P.3d 522 (2002) ("[T]he proceedings must be fair, open, and impartial."); *In re Care & Treatment of Hay*, 263 Kan. 822, Syl. ¶ 4, 953 P.2d 666 (1998) ("The fundamental requirement of due process is a fair trial in a fair tribunal."); *Davenport Pastures v. Board of Morris County Comm'rs*, 40 Kan. App. 2d 648, 653, 194 P.3d 1201 (2008) ("Simply put, due process requires the proceedings to be fair, open, and impartial. A denial of due process renders the resulting decision void.") (citing *McPherson Landfill*, 274 Kan. at 305).

The statute assigning county commissions the task of deciding these claims was, and is, an invitation for abuse. Due process con-

cerns immediately pique when confronted with such provisions. The fact that this private landowner has had to persevere through two successful appeals to reverse yet again the Board's handling of Davenport's claim strongly supports the statute's condemnation and a call for its revision. See *Davenport Pasture, LP v. Board of Morris County Comm'rs*, 31 Kan. App. 2d 217, 223-24, 62 P.3d 699, *rev. denied* 276 Kan. 967 (2003) (Board's finding was contrary to well-recognized Kansas common law that owner of property abutting a public road has a private property right in access to that road.). This is why the Board's performance under this statute necessarily invites due process scrutiny and requires its commissioners to be highly diligent when conducting such proceedings.

The Board must establish a process that exhibits characteristics fair-minded people can believe are appropriate to objectively hear the evidence and fairly determine what monetary damages the aggrieved private landowner is due from the county treasury. This may not be impossible under this statute, but it is far more difficult than it would be if the law provided for this decision to be made by a more detached factfinder, such as is required in eminent domain proceedings. See K.S.A. 2009 Supp. 26-501 (proceedings shall be brought in district court of county where land is situated); K.S.A. 2009 Supp. 26-504 (vesting district court with power to appoint appraisers after entertaining suggestions from any party). While the court's opinion today does not describe the minimum requirements for a Board's fair handling of claims arising under K.S.A. 68-102a, it is clear that to ensure fairness a Board must do significantly more than was done in this case to date.

As explained in our court's opinion, the Board's decision to have its attorney play such a significant and multifaceted role in the hearing process violated its responsibilities to provide fair dealing and offends any reasonable definition of fair play for an adjudicative process. Indeed, our Kansas Administrative Procedures Act, K.S.A. 77-501 *et seq.*, long ago prohibited the very practice employed here, *i.e.*, having the same attorney advising a board while advocating a position in the same matter before that board. See K.S.A. 77-514(h) (person shall not provide legal advice to presiding officer if person served in investigatory or prosecutorial capacity).

On remand, the Board would be well advised to figure out a structured decision-making process that will exhibit neutrality and detachment toward both sides of this dispute. This is especially necessary to overcome the inherent conflict of interest the statute creates. Due process requires no less.